UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

<table>
<tr><td>Maher & Williams; Roy Kalman; Catherine M. Sieling;<br>Ashley Sieling; Amanda Sieling; Karl Sieling, Sr.; Karl<br>Sieling, Jr.; and Ramona M. Prokoski,<br>     <em>Plaintiffs</em>,<br><br>     <em>v.</em><br><br>ACE American Insurance Company,<br>     <em>Defendant</em>.</td><td>Civil No. 3:08cv1191 (JBA)<br><br><br><br><br><br>September 3, 2010</td></tr>
</table>

RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT [Doc. ## 78, 79]

Plaintiff Maher & Williams ("M&W" or the "Firm"),[1] a Connecticut law firm, brings suit

against Defendant ACE American Insurance Company ("ACE") for declaratory relief as well as for

breach of contract and the covenant of good faith and fair dealing regarding ACE's determination

that M&W was not entitled to coverage under a legal–malpractice insurance policy for three suits

brought against M&W by former clients, each of whom alleged that one of M&W's former attorneys,

James L. Sullivan, had committed legal malpractice. ACE asserts that M&W is not entitled to

coverage and brings two counterclaims against M&W for declaratory relief to that effect. ACE has

moved for summary judgment on M&W's claims against it, and M&W has moved for partial

summary judgment on its declaratory–judgment and breach–of–contract claims and on ACE's two

declaratory–judgment counterclaims. For the reasons that follow, M&W's motion for partial

---

[1] M&W amended its complaint a number of times to add as assignee–plaintiffs the former clients who had sued it. These individuals are listed in the caption, but because they are in this case only as assignees of M&W's rights against ACE, the Court will refer to M&W as the Plaintiff and the Sielings, Prokoski, and Kalman as the "Assignee–Plaintiffs." Now operative are the Revised Fourth Amended Complaint [Doc. # 117] and the Defendant's Answer to Fourth Amended Complaint with Counterclaims [Doc. # 119].

summary judgment will be granted, and ACE's motion for summary judgment will be granted in part and denied in part.

I.      Facts

Although the record in this case is substantial, relevant story is largely uncontested.

A.      The Policy

M&W is a law firm that was founded in 1984 and is based in Fairfield. Its name partners are Kevin J. Maher ("Maher") and Scott Wilson Williams ("Williams"). On August 17, 2006, Maher, on M&W's behalf, completed, signed, and submitted to ACE an Application for Lawyers Professional Liability Insurance (the "Application") (Zaroski Decl. Ex. A; Pl.'s Ex. 2) for liability insurance that would begin on October 1, 2006. He requested a coverage limit of $3 million with a deductible of $15,000. In the Application, Maher set forth the following information: the Firm had seven attorneys, including Sullivan; Sullivan accounted for 15 percent of the Firm's billings; the Firm employed a computer system to keep track of deadlines; and in the preceding five years no Firm attorney had been the subject of a disciplinary complaint, and neither the Firm nor its attorneys had been the defendant in any suit. Maher also answered "no" to the following two questions:

> Has any attorney of [the Firm] in the last five years failed to meet a deadline which has been established by any applicable substantive or procedural rules, laws, or statutes?

> Does any attorney of [the Firm] know of any incident, circumstances, acts, errors, omissions, or personal injuries that could result in a professional liability claim against any attorney of the firm or its predecessors irrespective of the actual validity of such claim?

Just above Maher's signature was a "Notice to Applicants" that read in pertinent part:

> By signing this application, the [Firm] warrants to [ACE] that all statements made in this application and attachments hereto about the [Firm] and its operations are true and complete, and that no material facts have been misstated or misrepresented in this application, suppressed or concealed. The undersigned agrees that if after the date of this application and prior to the effective date of any policy based on this application, any occurrence, event or other circumstance should render any of the information contained in the application inaccurate or incomplete, then the undersigned shall notify [ACE] of such occurrence, event or circumstance and shall provide [ACE] with information that would complete, update or correct such information.

Five weeks later, on September 21, 2006, Sullivan, who had been a partner, left the Firm. Four days later, on September 25, 2006, Maher, on M&W's behalf, sent a warranty letter to ACE that represented that as of that date

> there have been no material changes in the application submitted which is signed and dated August 17, 2006 . . . and that any person to be insured does not have knowledge or information of any act, error or omission which might reasonably be expected to give rise to a claim against the applicant at some point in the future.

> The signing of this warranty letter will confirm that the [F]irm has circulated this letter to each attorney in the [F]irm or has in place such internal controls that would disclose the information requested herein to the management committee of the [F]irm.

(Zaroski Decl. Ex. B & Pl.'s Ex. 3.)

ACE thereafter issued to M&W a Lawyers Professional Liability Insurance policy bearing Policy Number LPLG21531790 (the "Policy"). (Zaroski Decl. Ex. C & Pl.'s Ex. 1.) The Policy listed "Maher and Williams" as the "Named Insured," set forth the policy period listed above (an inception date of October 1, 2006 and a termination date of October 1, 2007), and provided a per-claim and total liability limit of $3 million with a $10,000 deductible per claim. The Policy specified that it "is a claims made policy" and "is limited to liability for only those claims that are first made against the

insured and reported to [ACE] in writing during the policy period." The Policy provides that ACE "has the right and duty to defend . . . any Claim made against an Insured during the Policy Period and reported in writing to [ACE] during the Policy Period . . . for any actual or alleged Wrongful Act for which coverage is afforded under this [P]olicy, even if any of the allegations of the Claim are groundless, false, or fraudulent." It further defines a "Wrongful Act" as "an act, error, or omission, including but not limited to breach of contract or duty (including but not limited to Fiduciary duty) and Personal Injury," and lists the following "Coverage":

> This [P]olicy will pay on the behalf of the Insured, Loss arising from a Claim first made against the Insured during the Policy Period and reported in writing to [ACE] during the Policy Period . . . pursuant to the terms of this [P]olicy for any actual or alleged Wrongful Act whenever or wherever such Wrongful Act has been committed by:
>
> 1. The Insured in the rendering or failing to render Professional Legal Services for others; and
>
> 2. Any other person or Entity in the rendering or failing to render Professional Legal Services for others on the behalf of the Firm for whose Wrongful Act an Insured is legally responsible.

(Policy at 7.) Under the Policy, an "Insured" is "the Firm and any person or Entity which was, is, or . . . becomes," *inter alia*, "a partner, principal, director, officer or shareholder of the Firm" or who is "designated as 'counsel' or 'of counsel' to . . . the Firm." (*Id.* at 10.) The Policy also includes a pertinent prior–knowledge exclusion:

> This [P]olicy excludes coverage for any Loss in connection with a claim . . . [a]rising out of, based upon, attributable to, or alleging a Wrongful Act occurring prior to the inception date of the first lawyers professional liability policy issued to the Firm by [ACE] and continuously renewed and maintained in effect thereafter to the inception date of this policy if the (1) Firm, (2) any partner, principal, director, officer or shareholder of the Firm, (3) any member of the Firm's management or

executive committee, or (4) any person with management responsibility for evaluating or dealing with actual or potential Claims, knew or should have reasonably foreseen on the inception date of such first policy that such Wrongful Act could be the basis of Claim.

(*Id.* at 12.) Finally, in "condition" V.Q, captioned "entire agreement," the Policy provides as follows:

By acceptance of this [P]olicy Insured agrees that the statements in the Declarations and Application are the Insured's statements and representations, that this [P]olicy is issued in reliance upon the truth of such representations and that this [P]olicy embodies all agreements existing between the Insured and [ACE] relating to this insurance.

(*Id.* at 17.)

B.     Sullivan's Representation in the *Sieling*, *Prokoski*, and *Kalman* Actions

The Firm's liability for damages in malpractice suits (the "Malpractice Suits") brought by three former M&W clients—Catherine Sieling and her family;[2] Ramona Prokoski; and Roy Kalman—are at issue in this dispute.  Until some time after the Policy's inception date, no one at M&W had actual knowledge of Sullivan's handling of the Sieling, Prokoski, and Kalman matters except Sullivan himself.  Sullivan avers that "I had responsibility for the Firm's work on [the three] matters, and I did not communicate with any of my partners about any of the challenges . . . that I faced in prosecuting any of them."  (Sullivan Aff., Szczepanski Decl. Ex. B & Pl.'s Ex. B, at ¶ 18.)  The affidavits of five M&W attorneys—Williams, Maher, Moran, Driscoll, and Klein—are consistent with Sullivan's averment.  (*See* Williams Aff., Pl.'s Ex. A, at ¶ 17; Maher Aff., Pl.'s Ex. B, at ¶¶ 12–13;

---

[2] The individual identities of the members of the Sieling family are immaterial to this Ruling, and therefore the Court refers to them either as the Sielings or the Sieling Family.

Moran Aff., Pl.'s Ex. C, at ¶¶ 9, 11; Driscoll Aff., Pl.'s Ex. D, at ¶¶ 4, 5; Klein Aff., Pl.'s Ex. D, at

¶¶ 4, 5.)  ACE has proffered no admissible evidence to the contrary.[3]

### 1. *Sieling* Matter

Catherine Sieling was in a car accident on April 10, 1999, and she and her family retained

M&W to bring suit against the other driver to recover damages for her personal injuries (the "Sieling

Underlying Suit").  In 2001 M&W attorney James Moran signed and filed the summons and

complaint in the Sieling Underlying Suit, but Sullivan thereafter handled all of the work on the case.

(ACE's 56(a)1 Stmt. [Doc. # 84] at ¶¶ 1, 2 (admitted by M&W); Sullivan Aff. at ¶ 18.)

On December 12, 2006—during the Policy Period—in a letter addressed to Sullivan at M&W,

attorneys thereafter retained by the Sieling Family informed M&W that they were "investigat[ing]

filing a legal malpractice claim against you for your representation of them as it pertains to th[e

---

[3] ACE has proffered a summary of an interview that an ACE investigator conducted of Sullivan; the summary was apparently prepared by the investigator.  (*See* Summary of Sullivan Interview, Zaroski Ex. Z3.)  The record does not reveal who conducted the interview or when or to whom s/he produced the Summary.  According to the Summary, Sullivan stated many things that are consistent with the record evidence as recounted above.  This exhibit constitutes hearsay, since ACE relies on the statements Sullivan is reported to have made for the of those statements, not merely the fact that he made those statements.  *See* Fed. R. Evid. 801(c), 802.  Sullivan was not a partner at M&W when he was interviewed, and therefore his statements are not statements of a party–opponent.  *See* Fed. R. Evid. 801(d)(2).  Consequently, the Court will not consider the Summary.  *See* Fed. R. Civ. P. 56(e)(1) (only admissible evidence may be considered in ruling on summary–judgment motion); *Patterson v. County of Oneida, New York*, 375 F.3d 206, 222 (2d Cir. 2004) (holding that hearsay testimony "was not competent evidence in opposition to summary judgment in the present case because, as proffered, it was hearsay and was neither reaffirmed in an affidavit by [witness] stating, for example, that he would give the same testimony at a trial of [the plaintiff's] claims, nor supported by any showing that that prior testimony would be admissible under Fed. R. Evid. 804(b)(1) if offered by [the plaintiff] at trial").

April 1999] accident." The letter also asked Sullivan to put his malpractice insurance carrier on notice. (Zaroski Decl. Ex. E & F at 1.) Eleven months later, the Sielings filed a complaint against Sullivan and the Firm (the "Sieling Malpractice Suit"), in which they alleged certain facts that M&W has admitted in this litigation to be true. (*See* Summons & Complaint in Sieling Malpractice Suit, Zaroski Decl. Ex. I & Pl.'s Ex. 4.) In particular, it is undisputed that on April 1, 2003 the state court in which the Sieling Underlying Suit had been pending entered a judgment of non–suit on the basis of Sullivan's failure to respond to discovery requests. Although state law provides a four-month window in which to move to reopen the judgment, Sullivan did not do so for more than seven months, and in January 2004 the court denied Sullivan's motion as untimely. Almost three years later, in November 2006, the Sielings learned that Sullivan had misrepresented the status of their case to them. (ACE's 56(a)1 Stmt. at ¶¶ 5–7; Sieling Malpractice Suit Complaint at ¶¶ 1–12, 16.) Sullivan admitted in a deposition that additional allegations made in the Sieling Malpractice Suit were true: that notwithstanding the Sieling Underlying Suit having been dismissed in April 2003 and the motion to reopen having been denied in January 2004, he continued to speak with the Sielings, suggested until September or October of 2006 that the Sieling Underlying Suit was proceeding appropriately, met with them to prepare for depositions that he knew were not going to go forward because the case had been dismissed, and generally "led the Sieling [F]amily to believe that their case was pending and proceeding through the court system in a typical fashion." Sullivan testified that "it would be difficult for [him] to disagree with th[e]" allegation that "'he failed to properly research and prepare [the Sieling Underlying Suit] as a reasonably prudent attorney.'" (Sullivan Dep.,

Szczepanski Decl. Ex. B & Pl.'s Ex. 9, at 42–48 (quoting Sieling Malpractice Suit Complaint at ¶ 17).) It is undisputed that Sullivan committed legal malpractice in his handling of the Sieling Underlying Suit. M&W put ACE on notice of the Sieling Malpractice Suit on December 14, 2006.

### 2. *Prokoski* Matter

Also during the Policy Period, in June 2007, Ramona Prokoski served on M&W a summons and complaint naming M&W as the sole defendant and claiming legal malpractice (the "Prokoski Malpractice Suit"). (Summons & Complaint in Prokoski Malpractice Suit, Zaroski Ex. N & Pl.'s Ex. 6.) It is undisputed in this litigation that Prokoski retained M&W in February 1997 and thereafter paid M&W approximately $500 monthly to "represent[] [her] in civil actions against her employer, the State of Connecticut" for "discrimination based upon disability and retaliation." (*See* Szczepanski Decl. Ex. I (copies of cancelled checks); Prokoski Malpractice Suit Complaint at ¶¶ 1, 3, 4; Sullivan Aff. at ¶ 17.) Sullivan filed a civil action on Prokoski's behalf in August 2001, and a pre–trial conference was scheduled for October 2005. It was continued, on the State's request, to November 2005. According to Sullivan, the State again moved for a continuance with Sullivan's consent. Because he consented, Sullivan expected the motion to be granted, but apparently it was not, and when Sullivan did not appear for the conference, the clerk of court called him. Sullivan could not attend due to other commitments, and "[t]he clerk indicated that the court would enter a judgment of dismissal, but that [he] could file a motion to open." (Sullivan Aff. at ¶ 17.) He prepared a motion in December 2005 and planned to file it, but for a "reason unknown to [him] or anyone at [M&W], the motion to open was not entered on the court's docket and was never acted

upon." (*Id.*)  The court's electronic docket does not now, and did not then, reflect the motion as having been filed.  Sullivan avers that he did not believe "the *Prokoski* matter [to be] a potential claim predating the [Firm's insurance] [A]pplication because the Firm and I had done nothing wrong," having "reasonably anticipated that the continuance . . . would be granted and then, when it was not granted and a judgment of dismissal was entered," and believing that he had "timely filed a motion to open the judgment of dismissal." (*Id.*)  In the Prokoski Malpractice Suit, Prokoski alleges that M&W did not inform her of the dismissal, did not timely move to vacate or set aside the dismissal, and did not re–file the lawsuit within one year of dismissal.  (Prokoski Malpractice Suit Complaint at ¶¶ 6, 9.)  She alleges that she found out about the dismissal when she wrote to M&W on November 14, 2006—after Sullivan had left—and M&W "informed her for the first time that she had lost her action in the manner described above." (*Id.* at ¶ 7.)  M&W put ACE on notice of the Prokoski Malpractice Suit on July 5, 2007.

       3.    *Kalman* Matter

Finally, Roy Kalman, a practicing OB/GYN, was involved in a car accident in 1994, and five years later "had a cervical fusion which according to [him] made him unable to carry out the obstetrics aspect of his practice" (but left him able to "perform the gynecological aspect of his practice").  He had disability–insurance policies with three insurers—Monarch, Penn Mutual, and Minnesota Life.  (Sullivan Aff. at ¶ 16.)  In 1999, Kalman retained M&W to process his disability benefits claims.  Sullivan saw that the benefits under the Monarch policy were by far the largest, so he focused on filing Kalman's claim with Monarch.  Monarch informed Sullivan in April 2000 that

it had denied Kalman's benefits claim "due to Dr. Kalman's failure to provide proof of loss information required by the disability policies." Subsequently, between 2001 and 2003, Sullivan asked Kalman for, and Kalman provided to him, the information for which Monarch had asked. In December 2003 Monarch sent a letter approving benefits for the period after September 2001 (during which Sullivan had been submitting Kalman's documentation to Monarch) but reaffirming denial of benefits for the previous two years for lack of documentation. (*Id.*) According to Sullivan, "I made repeated efforts to obtain the documentation from [Kalman]," provided all documentation to Monarch, and anticipated that upon receipt of the information for 1999–2001, either Monarch would approve his claim or Kalman would have a breach-of-contract claim against Monarch. (*Id.*) According to Sullivan, he "also diligently pursued the disability policies issued to Dr. Kalman by Minnesota Life and Penn Mutual," each of which, like Monarch, denied the claims for lack of documentation. Again, Sullivan thought that upon submission of the documentation Kalman would either get the benefits or have breach–of–contract claims against the insurers. (*Id.*)

Nonetheless, Kalman retained counsel to pursue a malpractice claim against Sullivan and M&W, and on December 27, 2006—during the Policy Period—that counsel sent Sullivan a letter at M&W stating that it was "investigat[ing] filing a legal malpractice claim against you for your representation of [Kalman] as it pertains to obtaining disability payments for injuries he suffered" and asking M&W to inform its malpractice insurance carrier of the letter. (Zaroski Decl. Ex. T & U at 1.) In September 2007 counsel for M&W and for Kalman engaged in settlement negotiations by letter (*see* Louis Blumenfeld Letter to Douglas Mahoney, Zaroski Decl. Ex. X), but they apparently

did not result in a settlement, and Kalman filed suit against Sullivan and M&W (the "Kalman Malpractice Suit") in November 2007. The Kalman Malpractice Suit alleged that until late 2006 Sullivan represented to Kalman that suit and settlement negotiations were ongoing but that Kalman learned in November or December 2006 that Sullivan had never filed any lawsuits, and that his claims were therefore time-barred, even though Sullivan had represented that the cases were still pending. M&W put ACE on notice of the Kalman Malpractice Suit on January 3, 2007.

      C.      ACE's Investigation and Determination of Non–Coverage

As noted above, M&W put ACE on notice of the Sieling Malpractice Suit on December 14, 2006. A month later, on January 17, 2007, ACE sent to Moran at M&W an Initial Coverage Letter that recited various portions of the Policy (including those at issue in this action), stated that it was ACE's understanding that "Sullivan[] was the lawyer in charge of the Sieling matter" and that "Sullivan left the firm on September 21, 2006," and stated that "the Insurer reserves its rights as to whether the Insured had knowledge prior to the inception of the Policy Period of any incidents, circumstances or acts that could result in a claim," otherwise "advise[d] that the Insurer has accepted the defense of the Insured in this matter, subject to the reservation of rights noted herein," and reiterated that "we reserve all of the Insurer's rights, remedies and defenses." (Zaroski Decl. Ex. G.) On July 19, 2007, after M&W put ACE on notice of the Prokoski Malpractice Suit on July 5, 2007, ACE issued to M&W an Initial Coverage Letter that stated all of the same things as the Initial Coverage Letter regarding the Sieling Malpractice Suit, except the Prokoski Initial Coverage Letter said nothing about Sullivan. (Zaroski Decl. Ex. P.) Finally, on January 17, 2007, after M&W put

ACE on notice of the Kalman Malpractice Suit on January 3, 2007, ACE issued to M&W an Initial Coverage Letter that was virtually identical to the Sieling Initial Coverage Letter. (Zaroski Decl. Ex. V.) By letter, ACE requested additional information from M&W as to the Sieling Malpractice Suit, again specifying that it was reserving its rights. (Zaroski Decl. Ex. K.)

ACE scheduled a meeting with Sullivan for March 4 & 5, 2008. (*E.g.*, Zaroski Decl. Ex. K.) Three months after ACE's interview of Sullivan, on June 8, 2008, ACE issued to M&W and Sullivan denial–of–coverage letters in all three cases (*i.e.*, Sieling, Prokoski, and Kalman) on the basis of the prior–knowledge exclusion. (Zaroski Decl. Ex. L (Sieling), Ex. S (Prokoski), Ex. Z2.)

M&W filed suit against ACE in state court less than a month later. The action was thereafter removed to federal district court.

D.      Settlement Negotiations in This Litigation

On December 5, 2008, this Court referred this action "to Special Master Paul Pollock . . . for the purpose of conducting a settlement conference." (Order of Referral [Doc. # 41].) The Court directed counsel to ensure that "their clients and/or persons with settlement authority accompany them to this settlement conference," (*id.*), which was set for April 24, 2009 and in which no party was permitted to participate by telephone (*see* Special Master Settlement Conference Calendar [Doc. # 44]). Kevin Szczepanski, counsel for ACE, declares that he told David Friedman, counsel for M&W, multiple times over the course of months leading up to April 24, 2009 that ACE was willing to attend global settlement conferences involving not only ACE and M&W but also the Assignee–Plaintiffs whose Malpractice Suits were still then pending in state court, but that ACE did

not want this willingness "to be misconstrued as a willingness to contribute to settlement." A settlement conference was held on April 24th, no settlement was reached, and the parties agreed to meet again.

On April 29, 2009, the Court issued a second "Special Master Settlement Conference Calendar" stating that a "second settlement conference" was scheduled for May 8, 2009, and directed that "[t]he parties shall be prepared to dedicate the entire day to this conference. Counsel are directed to have their clients and/or persons with settlement authority accompany them to this settlement conference (see D. Conn. L. Civ. R. 53(c)). No party may participate via telephone." (Notice of Electronic Calendar [Doc. # 52].) This second settlement conference was eventually rescheduled to June 1, 2009, but all other directives remained in place. (*See* Notice of E–Filed Calendar [Doc. # 53]; Minutes of Settlement Conference [Doc. # 56]; Szczepanski Decl. at ¶ 19.)

According to Szczepanski, "[o]n the afternoon of May 29, 2009, I was informed that due to a last–minute and unavoidable scheduling conflict, [Eric Levine, Claims Manager for ACE Westchester Specialty Group] would be unable to attend the June 1, 2009 settlement conference as ACE's representative," and Szczepanski "immediately contacted Mr. Friedman and informed him of Mr. Levine's scheduling conflict." (*Id.* at ¶¶ 20, 21.) Szczepanski offered to have Laura Zaroski, a partner in the Chicago office of the law firm that "is the authorized claim administrator" for ACE (Zaroski Decl. at ¶ 1), "and Jeffrey Sorkin, Assistant Vice President of ACE Westchester Specialty Group in Roswell, Georgia," available by phone (Szczepanski Decl. at ¶ 22.) Friedman didn't object, and "[a]t least twice" during the June 1st settlement conference Szczepanski "spoke at length with

Ms. Zaroski to convey the status of the discussions and Special Master Pollock's settlement recommendations," and Zaroski spoke with Sorkin. Szczepanski declares that "[a]s a result of [the Szczepanski–Zaroski–Sorkin] discussions, I was instructed that ACE would contribute a sum in the 'low six–figure range' if the underlying suits would settle as a result, which I conveyed to M&W's counsel and Special Master Pollock." (*Id.* at ¶¶ 23–25.) Zaroski declares similarly. (*See* Zaroski Decl. at ¶ 37.)

Friedman tells a different story than Szczepanski. He agrees that in the Fall of 2008 he suggested a global settlement conference with Szczepanski, who said he did not know ACE's position. Szczepanski thereafter represented that ACE was willing to attend and thought including the claimants would be helpful. (Friedman Aff., Pl.'s Ex. H, at ¶¶ 4–10.) On the eve of the April 24th mediation Szczepanski told Friedman that he would not be accompanied by an ACE representative. Friedman responded that attending without an ACE representative would violate the Court's order, and by the mediation, an ACE representative had arranged to accompany Szczepanski. (*Id.* at ¶¶ 12, 23, 15, 18–20.) "ACE, asserting the strength of its coverage arguments, took a no–pay position," and "[b]ecause Special Master Pollock, [M&W,] and the [claimants] believed that negotiations without ACE's participation were pointless, the conference was terminated in the middle of the afternoon, without any negotiations ever taking place between the parties to the coverage action and the [claimants]." (*Id.* at ¶¶ 23, 24.) Friedman avers that on May 4, 2009 Szczepanski told him "not [to] expect ACE to fund the settlements in the" Malpractice Suits "in their entirety," but did not say that ACE would refuse to pay at all. (*Id.* at ¶ 28.) Friedman avers

that the multiple reschedulings between April 29 and June 1 were due to ACE's scheduling conflicts, that they eventually agreed on a June 1st date, but that "[o]n the afternoon of Friday May 29, 2009, Attorney Szczepanski announced to me that ACE would not be sending a person with settlement authority to the mediation and that no person with settlement authority would be personally present during the Monday, June 1, 2009 conference," but Szczepanski told Friedman of the availability by phone of ACE representatives. (*Id.* at ¶¶ 29–33.) At the June 1st conference ACE again asserted a no–pay position, and then "ACE's counsel stated that if the negotiations between [M&W] and the [claimants] brought all of those parties close to a settlement, then ACE would consider offering a modest sum to close the deal with all Plaintiffs (in an amount that was not specifically quantified), but ACE would not offer any money with which to negotiate with the [claimants]." (*Id.* at ¶ 35.) Szczepanski refused Pollock's request to convey Pollock's request that ACE to offer at least a small contribution. (*Id.* at ¶ 36.) Szczepanski refused Friedman's request that he reconsider, and, "[c]onfronted with this fundamental impasse, the parties and counsel agreed to terminate the settlement conference in the middle of the afternoon of the second day, without any negotiation ever having taken place with the [claimants]." (*Id.* at ¶ 41.)

Some months later, the parties cross–moved for summary judgment.

II.    Standard

"Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir. 2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as

to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c)(2). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

III.    Discussion

 A.    Breach of Contract and Declaratory–Judgment Claims

M&W's breach–of–contract claim and the parties' four collective declaratory–judgment claims all raise the same question: does ACE have duties, under the Policy, to defend and indemnify M&W in the three Malpractice Suits? As explained below, ACE has a duty to defend and indemnify M&W in each of the three Malpractice Suits. By failing to defend or indemnify M&W, ACE has therefore breached the Policy. As a result, M&W is entitled to summary judgment on its breach–of–contract claim as well as its two declaratory–judgment claims, and ACE is not entitled to summary judgment on its declaratory–judgment counterclaims.

"The relationship between an insured and insurer has been characterized by the Connecticut courts as one based solely upon contract. Although there may be circumstances when dealing with third–party claims that fiduciary duties arise between an insurer and its insured, such is not the case in first–party disputes between an insurer and insured." *HSB Group, Inc. v. SVB Underwriting, Ltd.*, 664 F. Supp. 2d 158, 179 (D. Conn. 2009) (citations omitted).

ACE does not argue that M&W's claims fall outside of coverage. Instead, the parties' dispute centers on whether any exclusion applies or whether M&W failed to fulfill a condition precedent to coverage.

### 1. Exclusion IV.A — The Prior Knowledge Exclusion

The first and primary dispute between the parties is the applicability of Exclusion IV.A, which ACE, as the insurer, has the burden of establishing. *See, e.g.*, *Liberty Mut. Ins. Co. v. Lone Star Indus., Inc.*, 290 Conn. 767, 807 (2009) (citing *Buell Indus., Inc. v. Greater New York Mut. Ins. Co.*, 259 Conn. 527, 550–51 (2002)). As noted above, this provision excludes coverage for any Wrongful Act if the Firm, any Firm partner, or any member of the Firm's management or executive committee "knew or should have reasonably foreseen on the inception date of such first policy that such Wrongful Act could be the basis of Claim." This exclusion, which turns on the prior knowledge of particular listed entities, is designed to "'to ensure that only risks from unknown losses are insured.'" *HSB Group*, 664 F. Supp. 2d at 165 n.7 (quoting Mark Wade & Patricia Essoff, Lawyers Professional Liability: A Primer on Prior Knowledge, 30 The Brief 29, 35 (Fall 2000)). In light of the general principle, codified in Connecticut, that absent fraud a partner's actual knowledge of partnership–related facts is imputed to the partnership, the parties dispute the applicability of this exclusion in three interrelated respects: (1) whether Sullivan was one of the persons whose knowledge or reasonable foreseeability is contemplated by Exclusion IV.A; (2) whether the imputation principle operates such that Maher, or the Firm itself, must be deemed to have known of Sullivan's acts notwithstanding Maher's and the Firm's lack of actual knowledge of those acts; and

(3) whether the Firm had actual knowledge of sufficient facts to constitute actual knowledge of wrongful acts.

### i.     Sullivan's Actual Knowledge of his Acts

Sullivan left the Firm on September 21, 2006, and therefore was not a member of the Firm on the Policy's inception date of October 1, 2006.  On the inception date, Sullivan was an "insured" (as a person who "was . . . a partner . . . of the Firm") but he was not any of the entities listed in the Prior–Knowledge Exclusion (the Firm, a Firm partner, or a member of the Firm's management committee).  The specificity with which the Policy describes the entities whose knowledge matters for Prior–Knowledge–Exclusion purposes renders inapposite the case on which ACE heavily relies, which involved prior–knowledge exclusion where the prior knowledge of *any insured* triggered the exclusion.  *See Napolitano v. Coregis Ins. Co.*, No. 3:01cv34(EBB), 2002 WL 34159094, *2 (exclusion barred coverage for, *inter alia*, "any CLAIM arising out of any act, error, omission, or PERSONAL INJURY occurring prior to the effective date of this policy if any *INSURED* at the effective date knew or could have reasonably foreseen that such act, error, omission or PERSONAL INJURY might be expected to be the basis of a CLAIM" (italics added)).[4].

ACE also argues that Sullivan's knowledge must be considered for purposes of Exclusion IV.A under the principle that "if it walks like a duck, quacks like a duck, and looks like a duck, then it's a duck."  (Def.'s Mem. Supp. [Doc. # 80] at 24 (quoting cases).)  Rather than following the duck

---

[4] *Napolitano* is also inapposite because unlike Sullivan, in *Napolitano* the attorney against whom the malpractice suit was brought never left the law firm.

principle, the Connecticut Supreme Court directs courts to look at the terms of the relevant insurance policy, which, when unambiguous, must "be given effect according to its terms." *See, e.g.*, *Nat'l Grange Mut. Ins. Co. v. Santaniello*, 290 Conn. 81, 88–89 (2009). The terms of Exclusion IV.A list a set of entities whose knowledge on the inception date controls applicability of the exclusion. Sullivan is not one of those entities, and particularly in light of the fact that unlike the Prior–Knowledge Exclusion, other exclusions in the Policy do refer to all Insureds,[5] the Court will not read the specific list of entities to mean the same thing as the defined term "Insureds," and therefore to render a nullity the Policy's distinction between the two. *cf. Hall v. Kemper Ins. Cos.*, No. 02CA17, 2003 WL 22336027, *9 (Ohio App. 4th Dist. Sept. 30, 2003) (rejecting argument that a single term, "you," should be interpreted broadly to mean *all insureds* when defining coverage, but narrowly to mean only the *named insured* when defining exclusion, and holding that broad interpretation governed scope of both coverage and exclusion). Read in contradistinction to these other exclusions, Exclusion IV.A's listing of the individuals whose knowledge triggers that exclusion cannot be read more broadly than the text implies, to invoke or rely on knowledge of other Insureds who are not actually listed in Exclusion IV.A. *See, e.g.*, *Ceci v. Nat'l Indem. Co.*, 225 Conn. 165, 175 (1993) ("Although some jurisdictions, as cited by the defendant, are not troubled by an interpretation of an insurance policy that creates a nullity of some provisions, we have consistently

---

[5] For example, Exclusion IV.B excludes coverage for any insured's wrongful act that is "criminal, fraudulent, malicious . . . or dishonest," and Exclusion IV.F excludes coverage for any insured's wrongful acts taken in the capacity of "a director, officer, employee . . ., or independent contractor of any entity other than an Insured."

stated that if it is reasonably possible to do so, every provision of an insurance policy must be given operative effect." (citations and internal alterations omitted)); *see also Goldberg v. Hartford Fire Ins. Co.*, 269 Conn. 550, 562 (2004) ("We decline to reduce these provisions to effective nullities."); *United Illuminating Co. v. Wisvest–Connecticut, LLC*, 259 Conn. 665, 674 (2002) ("[t]he law of contract interpretation militates against interpreting a contract in a way that renders a provision superfluous").

Nor does the fact that Sullivan was at one point a Firm partner make him a "partner" for purposes of Exclusion IV.A, since the only date on which any partner's knowledge mattered was the inception date, at which point Sullivan was not a partner. Exclusion IV.A itself reflects that ACE could have drafted, but did not draft, an exclusion dictating that knowledge on *or before* the inception date would control application of the exclusion. Indeed, the first phrase of Exclusion IV.A refers to acts "occurring prior to the inception date" of the first policy issued by ACE so long as the policy was "continuously renewed and maintained in effect thereafter to the inception date of this policy," but when ACE defined the time referent for the relevant knowledge or foreseeability, ACE specified "the inception date"—not, as before, "prior to" or "thereafter to" that date. By contrast to the Policy at issue here, application of other insurance policies' prior–knowledge exclusions turn on an attorney's knowledge both *on* and *before* the inception date. *Compare, e.g., Phila. Indem. Ins. Co. v. Atl. Risk Mgmt., Inc.*, No. CV064018752, 2009 WL 2783073, *6 n.9 (Conn. Super. Ct. Jul. 30, 2009) (involving a prior–knowledge exclusion by a different insurer excluding coverage for claims based on wrongful acts predating the inception date unless "*prior to the effective date of this Policy* . . . [t]he

'Insured' had no basis to believe that such 'Wrongful Act' might reasonably be expected to give rise to a 'Claim' under this Policy" (emphasis added)).[6]

The most natural reading of Exclusion IV.A—which ACE argues is not ambiguous—is that it excludes coverage for claims based on Wrongful Acts if, on October 1, 2006, any of the Firm's partners "knew or should have reasonably foreseen . . . that such Wrongful Act could be the basis of Claim." Because Sullivan was not a partner of the Firm on the inception date, his actual knowledge of his Wrongful Acts does not make Exclusion IV.A applicable.

ii.     Maher's and the Firm's Imputed Knowledge of Sullivan's Acts

As noted above, Connecticut has codified the common–law principle that a partner's actual knowledge is imputed to the partnership. The relevant statute provides that "[a] partner's knowledge, notice or receipt of a notification of a fact relating to the partnership is effective immediately as knowledge by, notice to or receipt of a notification by the partnership, except in the case of a fraud on the partnership committed by or with the consent of that partner." Conn. Gen. Stat. § 34-302(f); *see also Prisco v. Westgate Entmt., Inc.*, 799 F. Supp. 266, 270 (D. Conn. 1992) (citing former codification of § 34-302(f) for the proposition that "it is basic partnership law that

---

[6] ACE also argues that Sullivan's knowledge is pertinent to, and therefore triggers, Exclusion IV.A because Maher listed Sullivan as an M&W "attorney" on the Application. This argument is unavailing because it elides the distinction between an "attorney" (the Application's query) and a "partner, principle, director, officer or shareholder of the Firm" (as listed in Exclusion IV.A), and also because application of the Exclusion expressly turns on the knowledge *on the inception date*—on which date Sullivan held no position whatsoever with the Firm—and there is no textual basis in the Policy on which to interpret the Exclusion as defining the undefined term "partner" retroactively in this manner. *Ceci*, 225 Conn. at 175; *see also Goldberg*, 269 Conn. at 562; *Wisvest–Connecticut, LLC*, 259 Conn. at 674.

every partner is an agent of the partnership and that the knowledge of a partner regarding partnership affairs is imputed to all other partners").

As noted above, Sullivan undisputedly failed to tell any other individual at the Firm about his wrongful acts. As a partner in the partnership, Sullivan was "'bound in a fiduciary relationship'" with his partners and the Firm itself such that he had "a duty to disclose" the fact of these acts to the partnership. *Estate of Axelrod v. Flannery*, 476 F. Supp. 2d 188, 194 (D. Conn. 2007) (quoting *Konover Dev. Corp. v. Zeller*, 228 Conn. 206, 218 (1994)); *see also Fichera v. Mine Hill Corp.*, 207 Conn. 204, 210 (1988). Of particular import here, "'[a]n action will lie for a fraudulent nondisclosure that causes one to continue in a course of action.'" *Id.* (quoting *Dockter v. Slowik*, 91 Conn. App. 448, 458 (2005)).

Even assuming, however, that Sullivan had not committed a fraud on the partnership, Sullivan's knowledge of his wrongful acts should not be imputed to Maher as of the inception date of the Policy. Courts applying prior–knowledge exclusions to claims–made insurance policies use "a two–part, subjective–objective test" to determine whether the exclusion bars coverage for a particular claim, asking "first, whether the insured had *actual knowledge* of a [wrongful act], a subjective inquiry; and second, whether a reasonable professional in the insured's position might expect a claim or suit to result, an objective inquiry." *See HSB Group*, 664 F. Supp. 2d at 193 (emphasis added). As the court pointed out in *HSB Group*, the Third Circuit has mandated this approach, *see Colliers Lanard & Axilbund v. Lloyds of London*, 458 F.3d 231, 233 (3d Cir. 2006); *accord Selko v. Home Ins. Co.*, 139 F.3d 146, 152 (3d Cir. 1998), and more recently the Supreme

Court of Kansas, broadly canvassed the case–law and considered the theoretical purpose of insurance and of prior–knowledge exclusions, and approved application of the two–part subjective–objective test, *see Am. Special Risk Mgmt. Corp. v. Cahow*, 286 Kan. 1134, 1154–57 (2008).

Courts' approval and application of this two–part test comports with a conclusion that application of the prior–knowledge exclusion in M&W's Policy must turn on the *actual* knowledge of the persons and entities listed in Exclusion IV.A. In *HSB Group*, for example, the defendant–insurer, SVB, argued that because lower–level employees at the insured, HSB, had reason to foresee a claim before inception of the policy, the prior–knowledge exclusion barred coverage. The court rejected that argument, holding that the exclusion "bars coverage only for such circumstances that, on the inception date, were known to HSB's in–house lawyers or directors," because only the lawyers and directors negotiated and executed the insurance policy. *See* 664 F. Supp. 2d at 192.[7] Like *HSB Group*, *Colliers*, and *Cahow*, other courts examining prior–knowledge exclusions have looked to the *actual* knowledge of the insured. *See, e.g.*, *Coregis Ins. Co. v. Wheeler*, 24 F. Supp. 2d 475, 479 (E.D. Pa. 1998) (following *Selko* and explaining that to show applicability of prior–knowledge exclusion, insurer has "burden to prove that the necessary underlying facts were *actually known to the insured*" (emphasis added)).

---

[7] *HSB Group* did not turn on the question at issue in this case, however, because the evidence in that case showed there to be "no question that as of [the inception date], HSB's legal department knew of the . . . event or incident that could give rise to a claim," and therefore "the first subjective prong of the Exclusion [wa]s satisfied." 664 F. Supp. 2d at 194.

Between them the parties offer a single case addressing precisely the issue raised here: whether a law–firm partner's actual but undisclosed knowledge of his own wrongful acts may be imputed to the other partners who thereafter obtained a claims–made professional liability insurance policy. In *Kopelowitz v. Home Insurance Co.*, 977 F. Supp. 1179 (S.D. Fla. 1997), the plaintiff, Kopelowitz, sued his attorney, Breitner, as well as the attorney's partner, Shapiro, and their law firm for legal malpractice. Like ACE, the firm's insurer, Home, refused to defend; like M&W, the defendants settled by admitting liability and assigning to Kopelowitz their rights to proceed against the insurer. *Id.* at 1182–83. Kopelowitz then sued Home on *Shapiro's* insurance; Home argued the policy "excludes coverage for undisclosed acts or occurrences arising prior to issuance of the policy if those claims were foreseeable or reasonably discoverable by the insured at the time of application." Rejecting the insurer's argument that Breitner's knowledge was imputed to Shapiro for prior–knowledge–exclusion purposes, the court held:

> Home also argues that under Florida law, it doesn't matter that Shapiro knew of the potential claim, only that someone in his firm was aware. According to Home, even if Shapiro had no knowledge, Breitner must surely have been aware of his own negligence, and Breitner's knowledge is imputed to Shapiro under Florida law. *See* Fla. Stat. Ann. § 620.615.[]

> To begin, the Court notes Home has not produced a single case holding that Fla. Stat. Ann. § 620.615 stands for the proposition so advanced. Indeed, it seems illogical to argue that knowledge of one partner may be imputed to another for purposes of requiring *disclosure* of such imputed knowledge. *Cf. First American Title Insurance Company v. Kessler*, 452 So.2d 35, n. 6 (Fla. 3d DCA 1984). Certainly, Florida law holds innocent partners liable for acts of other partners through the concept of imputed knowledge. Application of the concept of imputed knowledge forms the basis of this entire litigation. Nonetheless, this Court will not extend § 620.615 to require that *imputed* knowledge must be disclosed.

*Id.* at 1190 (emphases in original).[8] *Kopelowitz* contains little analysis of the issue presented in this case, but whatever weight it does carry favors M&W's position.

In addition, there is no theoretical basis on which to exclude coverage for claims based on wrongful acts imputedly but not actually known to an insured. The very function of the prior–knowledge exclusion is "to ensure that only risks from unknown losses are insured," *see HSB Group*, 664 F. Supp. 2d at 165 n.7. As the treatise on which *HSB Group* relied explains, "[t]he prior knowledge clause operates prospectively from the time of application to preclude coverage of any future claim that arises from submitted claim information in response to the application question eliciting the applicant's pre-existing knowledge. Theoretically, this temporal limitation serves to enforce one of the primary axioms of insurance, namely, that insurance is intended to cover only the *risk of unknown loss.*" Lawyers Professional Liability: A Primer on Prior Knowledge, 30 The Brief 29, 35 (Fall 2000) (emphasis added); *accord Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Stroh Cos., Inc.*, 265 F.3d 97, 109 (2d Cir. 2001) (citing support for proposition that "the known loss doctrine bars coverage not merely for losses that the insured knows have already occurred at the time insurance is purchased, but also for losses that have not occurred but the prospective insured

_____

[8] The case cited within *Kopelowitz* is inapposite here because the policy at issue there specifically defined "knowledge" as only actual knowledge, and not constructive knowledge or inquiry–notice knowledge. *See Kessler*, 452 So.2d at 35 n.6 ("The policy defines 'knowledge' as 'actual knowledge, not constructive knowledge or notice which may be imputed to an insured, by reason of any public records.'").

In 1998 Florida repealed the statute referenced in *Kopelowitz* and replaced it with another codification of the imputed–knowledge rule. Both the current and former Florida statutes are materially similar to the Connecticut statute. *Compare* Conn. Gen. Stat. Ann. § 34-302(f) (West 2010), *with* Fla. Stat. Ann. § 620.8102(6) (West 2010) *and* Fla. Stat. Ann. § 620.615 (West 1997).

knows inevitably will occur " (citing *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56, 63 (3d Cir. 1982) (noting that "the purpose of insurance is to protect insureds against unknown risks," and barring coverage under liability policy where "the risk of liability was no longer unknown" at the time the policy became effective))).  The theoretical foundation of the prior–knowledge exclusion thus suggests that if an entity applying for claims–made insurance does not *actually* know of the wrongful acts that will or should reasonable be foreseen to result in a claim, but instead is deemed to know only by operation of law (but not of fact), then there is no reason to exclude that claim from coverage since such a claim would not be a "known loss."

Finally, a Policy Condition suggests a distinction even within the Policy between actual and imputed knowledge.  Condition V.F, the "Innocent Insured" condition, provides that "[w]henever coverage under this [P]olicy would be excluded, suspended, lost or forfeited . . . because of noncompliance with Section D 'Notice of Claim and Claim Reporting Procedures', by one or more Insureds responsible for the Loss insured hereunder, [ACE] agrees that coverage under this [P]olicy shall not be excluded by reason of such . . . noncompliance with such Section D with respect to any individual Insured who did not commit such Wrongful Act."  Condition D (to which Condition V.F refers when it refers to "Section D") makes "a condition precedent to the Insureds' right to coverage under this [P]olicy" the reporting by "the Firm or its Designee . . . to [ACE] in writing of such Claim or Wrongful Act as soon as practicable during the Policy Period or within 60 days after the end of the Policy Period."  Each lawyer in the firm as of October 1, 2006 avers that he or she had no actual knowledge of Sullivan's wrongful acts, and thus the Firm argues that it, and those attorneys, should

be entitled to coverage. Regardless of whether Condition V.F applies on its own, the existence of the Innocent Insured condition indicates that in drafting the Policy ACE had in mind the possibility of exactly what occurred in this case—that a lawyer would commit wrongful acts but then conceal those acts from the partners or other lawyers—and Condition V.F. evidences an intent on ACE's part not to penalize insureds who do not have actual knowledge of the wrongful acts (and, therefore, the ability to report them and the foreseeable claims that may arise from them). The text of Condition V.F does not *compel* the result that Exclusion IV.A contemplates only actual, and not imputed, knowledge, but it suggests that such a reading would be consistent with the remainder of the Policy, which differentiates between insureds who have actual knowledge of wrongful acts from those individual insureds who do not.

In light of the two–part subject–objective test described above, the purpose of the prior–knowledge exclusion, and the holding in *Kopelowitz* (the only case revealed by the research of the parties and the Court to have addressed the issue), the Court holds that Exclusion IV.A, the Prior–Knowledge Exclusion, does not bar coverage where Maher and the Firm imputedly knew, but did not actually know, of Sullivan's Wrongful Acts. For these reasons, and even assuming that Sullivan had not committed fraud on the partnership, the claims based on Sullivan's wrongful acts do not fall within the prior–knowledge exclusion by virtue of the imputed, but not actual, knowledge of these acts by M&W or its partners.

### iii.    Maher's and the Firm's Actual Knowledge

As noted above, the Firm and its remaining partners received actual notice—and thus had actual knowledge—of the courts' actions in the Sieling Underlying Suit and Prokoski Underlying Suit. ACE argues that the Firm itself thus had actual knowledge of wrongful acts that could be the basis of a claim. M&W does not dispute that it received certain notifications, but contests ACE's characterization of the facts of which it had actual knowledge. Specifically, it is undisputed that the Firm had actual notice and knowledge of the state courts' November 29, 2005 judgment of dismissal against Prokoski and the April 1, 2003 judgment of nonsuit against Sieling, but M&W argues that it is not reasonably foreseeable, from these bare facts, that Sieling or Prokoski would bring suit against Sullivan or the Firm. The Court agrees.

As to the Prokoski Underlying Suit, the Firm's knowledge that it had been dismissed on November 29, 2005 is not knowledge of a Wrongful Act. In Connecticut, a plaintiff who has suffered a judgment of nonsuit has a year to bring a second suit in which she may raise the same claims. *See* Conn. Gen. Stat. § 52-592(a).[9] In Prokoski's case, that additional year did not expire

---

[9] The Connecticut General Statutes provide:

If any action, commenced within the time limited by law, has failed one or more times to be tried on its merits because of insufficient service or return of the writ due to unavoidable accident or the default or neglect of the officer to whom it was committed, or because the action has been dismissed for want of jurisdiction, or the action has been otherwise avoided or defeated by the death of a party or for any matter of form; or if, in any such action after a verdict for the plaintiff, the judgment has been set aside, or if a judgment of nonsuit has been rendered or a judgment for the plaintiff reversed, the plaintiff, or, if the plaintiff is dead and the action by law survives, his executor or administrator, may commence a new action, except as

until November 2006—after the Policy's inception date—and indeed, in the Prokoski Malpractice Suit, Prokoski alleges that her losses and injuries "were proximately caused by the negligence and legal malpractice of the defendants in that they failed to timely move to vacate or set aside the aforesaid dismissal *and in that they thereafter failed to refile the aforesaid lawsuit pursuant to the provisions of Connecticut General Statutes § 52-592(a) within one year of the judgment of dismissal.*" (Prokoski Malpractice Suit Complaint ¶ 9 (emphasis added).)  Therefore, the November 2005 dismissal of the Prokoski Underlying Suit was not and did not reflect a Wrongful Act by Sullivan known to the Firm or Maher on the Policy's inception date.  Therefore, M&W's claim to ACE for coverage for the Prokoski Malpractice Suit does not fall within the Prior–Knowledge Exclusion.

As to both the November 2005 Prokoski dismissal and the April 2003 judgment of nonsuit in Sieling's case, the Firm's and Maher's actual knowledge of these judgments does not constitute knowledge of Wrongful Acts because the bare facts of judgment of nonsuit or dismissal indicate nothing about Sullivan's handling of underlying suits.  As M&W points out, "the mere knowledge of a dismissal, by itself, is not meaningful in the context of this case," since it "could have been voluntary or stipulated and, without knowing the circumstances of the dismissal, there is no way to anticipate the potential for a malpractice claim."  The Court agrees.  It is impossible to know from a mere dismissal that the attorney prosecuting the case had committed an error, omission, or breach

provided in subsection (b) of this section, for the same cause at any time within one year after the determination of the original action or after the reversal of the judgment.

Conn. Gen. Stat. § 52-592(a).

of duty—that is, a Wrongful Act—because dismissals, including for nonsuit, can often result from negotiated settlements, a plaintiff's decision not to prosecute an action, or other forms of successful lawyering.[10] Maher's and the Firm had no knowledge of any facts contextualizing the dismissal and judgment, and therefore their actual knowledge of the judgment of nonsuit and dismissal does not constitute actual knowledge of a Wrongful Act.

For these reasons, M&W's claim to ACE for coverage for the Sieling Malpractice Suit does not fall within the Prior–Knowledge Exclusion on the basis of M&W's and Maher's actual knowledge of the facts that the Prokoski Underlying Suit and Sieling Underlying Suit were dismissed.

### 2. Condition V.Q — Truth of Statements and Representations

ACE next relies on Condition V.Q, which, as noted above, states that ACE issued the Policy in reliance on the truth of Maher's and the Firm's representations in the Application and the Policy's Declarations page. ACE argues that in signing the Application and the September 25th warranty letter, Maher materially misrepresented facts to ACE, first in the Application and Warranty Letter because Maher disclosed no known wrongful acts or missed deadlines notwithstanding Sullivan's

---

[10] In other words, the mere facts of dismissal, without context unknown to the Firm or Maher, did not reflect any Wrongful Acts because standing alone they cannot reasonably said to indicate "such an obvious and gross want of care and skill that the neglect to meet the standard of care is clear even to a layperson." *Moore v. Crone*, 114 Conn. App. 443, 446 (2009) ("Generally, to prevail on a legal malpractice claim, in Connecticut, a plaintiff must present expert testimony to establish the standard of proper professional skill or care. Not only must the plaintiffs establish the standard of care, but they must also establish that the defendant's conduct legally caused the injury of which they complain." (citations and internal alterations omitted)).

pre–Application wrongful acts and missed deadlines, and second in the Warranty Letter because Sullivan had left the firm by then, which constitutes a "material change[] in the [A]pplication." Both arguments are unavailing.

ACE's first contention, that Sullivan's departure constituted an undisclosed "material change[]," is unpersuasive. Upon Sullivan's departure the number of attorneys at M&W decreased to six from seven, or by 14 percent. Neither the Warranty Letter nor anything else in the record defines what changes would be "material," and the Policy itself directs M&W to inform ACE only when "the total number of lawyers in the Firm increases or decreases by more than 40% or 15, whichever is less" (Policy at 15 (§ V.I)). There is therefore no basis in the record on which to conclude that Maher's failure to disclose Sullivan's departure in the Warranty Letter was a failure to disclose a "material change[]."

ACE's second contention, that Maher and the Firm misrepresented their knowledge of wrongful acts or missed deadlines, has no merit primarily for the reasons stated above: Maher and the Firm did not have any actual knowledge of Sullivan's Wrongful Acts—including any missed deadlines—when Maher submitted the Application or on the Policy's inception date. In addition, ACE also misreads the warranty letter as containing Maher's representation that the Firm had "internal controls that would disclose the information requested herein to the management committee of the [F]irm," but in fact Maher used the disjunctive "or" in representing that the Firm *either* had such internal controls in place, *or* that "the [F]irm ha[d] circulated this letter to each attorney in the [F]irm." Notwithstanding its burden as the insurer to prove the applicability of an

exclusion from coverage, *Lone Star Indus., Inc.*, 290 Conn. at 807, ACE proffers no evidence that anything the Firm represented in the warranty letter was false, or, therefore, that the Firm misrepresented anything in the letter.

ACE also argues that Condition V.Q is a "condition precedent" to coverage,[11] and M&W's failure to fulfill it means that M&W has no right to enforce the Policy. *See, e.g.*, *Maloney v. PCRE, LLC*, 68 Conn. App. 727, 739 (2002) ("The legal consequence of the defendants' failure to satisfy the condition precedent to the modified agreement is clear: 'If the condition [precedent] is not fulfilled, the right to enforce the contract does not come into existence.'" (quoting *Lach v. Cahill*, 138 Conn. 418, 421 (1951); alteration in *Maloney*)). This argument also lacks merit. A contractual provision can be "a term, perhaps even an essential term, of the contract," without being a "condition precedent." *Glazer v. Dress Barn, Inc.*, 274 Conn. 33, 56 (2005). Absent express language, a provision will be construed as a condition precedent only if the implication from the contract's text is "so plain that a contrary intention cannot be supposed." *Multi–Serv. Contractors, Inc. v. Vernon*, 181 Conn. 445, 447–48 (1980); *accord* 13 *Williston on Contracts* § 38:13 (4th ed. 2010) ("Contract conditions are disfavored, and will not be found in the absence of unambiguous language indicating an intention to create a conditional obligation.").

There is no basis on which to conclude that Condition V.Q is a condition precedent. First, the Policy contains three provisions which, unlike Condition V.Q, expressly state that they are

---

[11] ACE also characterizes Condition V.Q as an "exclusion" (Def.'s Mem. Supp. at 15), but does not explain how the analysis would be different if Condition V.Q operated as an exclusion. As noted above, ACE has the burden of proving the applicability of an exclusion from coverage.

conditions precedent to coverage in certain circumstances.[12]  Moreover, there is no language in Condition V.Q that suggests conditionality; there is no "if/then" phrasing, and there is no expression of any reserved right to rescind the Policy or decline to provide coverage under it.  ACE also cannot rely on the facts that Condition V.Q is called a "condition" and is found in the "conditions" section, since the Policy expressly forbids reliance on "[t]he descriptions in the headings and subheadings of th[e] [P]olicy."  (Policy at 17 (§ V.O) ("The descriptions in the headings and subheadings of this [P]olicy are solely for convenience and form no part of the terms, conditions, exclusions and limitations of this [P]olicy.").)

Absent any textual or contextual indication that Condition V.Q is a condition precedent, the Court declines to interpret it as one.  Therefore, even if Maher or M&W had failed to comply with Condition V.Q, which they did not, such failure would not eliminate M&W's right to enforce the contract.

---

[12] *See* Policy at 14 (§ V.D.1) (where claim is made against an insured, or the same set of people/entities listed in Exclusion IV.A learns of a wrongful act committed by any insured that could be the basis of a claim, "then, as a condition precedent to the Insureds' right to coverage under this [P]olicy with respect to such Claim or Wrongful Act, the Firm or its Designee will give to the Company Notice in writing"); Policy at 16 (§ V.K.2) (allowing for an extended reporting period for attorneys permanently leaving legal practice; stating that "[i]t is a condition precedent to the issuance of [an] Extended Reporting Period . . . that the Insured cooperate with [ACE] and provide such documentation as may be requested by [ACE]"; and stating that "[a]s a condition precedent to the rights of the Firm under this Condition K.2, the Firm shall request a quote from [ACE] for such separate policy within 30 days of the Insured leaving the private practice of law").

### 3. Summary

ACE had a duty to defend and indemnify M&W in the three Malpractice Suits brought by the Sielings, Prokoski, and Kalman. Therefore, by failing to defend and indemnify M&W in these Malpractice Suits, ACE breached the Policy. M&W is thus entitled to summary judgment on its declaratory–judgment claims to that effect as well as on its breach–of–contract claim. ACE is not entitled to declaratory judgment in its favor on any claim.

### B. Breach of Covenant of Good Faith and Fair Dealing

M&W also claims that ACE breached the covenant of good faith and fair dealing in a number of ways.

> Connecticut recognizes an independent cause of action arising from a party's breach of the covenant of good faith and fair dealing, which is implied in all contracts including insurance contracts. *See, e.g., Buckman v. People Express, Inc.*, 205 Conn. 166, 171 (1987). . . . [U]nder Connecticut law, a plaintiff pursuing such a claim must show that: (1) two parties entered into a contract under which the plaintiff reasonably expected to benefit; (2) the benefit was denied or obstructed by the other party's actions; and (3) the other party's actions were taken in bad faith. *See Franco v. Yale Univ.*, 238 F. Supp. 2d 449, 455 (D. Conn. 2002).

*Van Dorsten v. Provident Life & Acc. Ins. Co.*, 554 F. Supp. 2d 285, 287 (D. Conn. 2008) (additional citations omitted). "The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term." *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 433 (2004). "[T]he acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." *Id.* "Subterfuges and evasions violate the obligation

of good faith in performance even though the actor believes his conduct to be justified. But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Elm Street Builders, Inc. v. Enterprise Park Condominium Ass'n, Inc.*, 63 Conn. App. 657, 667 (2001) (citations omitted).

ACE has moved for summary judgment on the basis that there is no evidence in the record that it acted in bad faith. In opposition, M&W argues that there are genuine issues of material fact as to ACE's bad faith on three bases: (1) "ACE acted in bad faith in denying coverage" because its arguments (both at summary judgment and in the denial–of–coverage letter) are "inconsistent with the plain language of [the prior–knowledge] exclusion"; (2) "ACE also acted in bad faith with regard to its duty to defend the Firm" in the Malpractice Suits because it "halted the defense of th[ose] [a]ctions in 'mid–stream'" and refused to pay the law firms it had hired to defend M&W, "*even those incurred prior to the time ACE notified [M&W] of its decision to withdraw its defense*"; and (3) "ACE likewise acted in bad faith by engaging in a mediation of this coverage dispute in a manner that appears to have been calculated to delay both this and the [Malpractice Suits] and impose significant costs on the Firm," including by "mis[leading] [M&W] and the [claimants] into believing that ACE would make fair offers on their claims and then refus[ing] to do so after many months of delay,"

"violat[ing] a court order requiring persons with authority to attend the mediation before a special master," and "maintaining a no–pay position." (Pl.'s Opp'n at 20–23 (emphasis in original).)

Although the Prior–Knowledge Exclusion does not exclude M&W's three claims from coverage under the Policy, the question was not a simple one, and although ACE read the exclusion in a manner rejected by the Court, its having taken that position does not indicate that it acted in bad faith. In addition, when ACE initially informed M&W that it had accepted coverage for M&W in each of the three matters, ACE expressly stated that it did so "subject to [a] reservation of rights," that it "reserve[d] all of [its] rights, remedies and defenses," and that its acceptance of coverage did not constitute "waive[r] [of] any rights that it has under the Policy, at law or in equity." (ACE Sieling Initial Coverage Letter, Zaroski Decl. Ex. G, at 7 (noting specifically that rights were reserved "as to whether the Insured had knowledge prior to the inception of the Policy Period of any incidents, circumstances or acts that could result in a claim"); ACE Prokoski Initial Coverage Letter, Zaroski Decl. Ex. P, at 6; ACE Kalman Initial Coverage Letter, Zaroski Decl. Ex. V, at 7 (noting specifically that rights were reserved "as to whether the Insured had knowledge prior to the inception of the Policy Period of any incidents, circumstances or acts that could result in a claim").) Therefore, M&W's first two arguments that the record shows bad faith must be rejected. *See McCulloch v. Hartford Life & Acc. Ins. Co.*, 363 F. Supp. 2d 169, 177 (D. Conn. 2005) (explaining that "a plaintiff cannot recover for bad faith if the insurer denies a claim that is 'fairly debatable,' i.e., if the insurer had some *arguably justifiable reason* for refusing to pay or terminating the claim," and collecting cases (emphasis added)).

The Court is similarly unpersuaded that ACE's behavior prior to and at the two settlement conferences demonstrates bad faith. Szczepanski's averment is undisputed that he learned of Levine's unavailability on the afternoon of Friday, May 29, 2009, the last business day before the settlement conference scheduled for Monday, June 1, 2009, and it is also undisputed that Levine was unavailable "due to a last–minute and unavoidable scheduling conflict." Although ACE's failure to have a person with settlement authority personally present at the conference was a violation of the Court's order, the circumstances do not indicate that ACE violated that Order in bad faith or with a sinister purpose. The record reflects that ACE did not take a no–pay position, but instead took the position that it would consider bridging any small gap remaining after M&W negotiated settlements with the Assignee–Plaintiffs. Nonetheless, even assuming that ACE's was a no–pay position, there is no evidence that ACE took that position in bad faith such as, for example, with the intent of willfully interfering with what it honestly believed to be M&W's entitlement to coverage. ACE took a firm and arguably justifiable, though ultimately incorrect, position that all three Malpractice Suits were excluded from coverage, and the record reflects no bad faith in ACE's taking this position. Therefore, the settlement–conference position ACE took, which reflected its legal position, was also not in bad faith.

M&W is also incorrect to characterize the record as reflecting that ACE misled M&W or the Assignee–Plaintiffs to believe that it would make fair offers on M&W's claims. Although ACE initially accepted coverage for all three Malpractice Suits, it did so under express reservations of rights to change its position, and in two cases specifically stated that it reserved its rights to assert

applicability of the Prior–Knowledge Exclusion on the basis of Sullivan's knowledge. By the time M&W initiated this action, and well before any settlement conferences were scheduled or held, ACE had already acted on the rights it had reserved, and had changed its position to be that M&W was not entitled to coverage.

Taken in the light most favorable to M&W, the summary–judgment record provides no basis on which a reasonable jury could conclude that ACE acted in bad faith in disclaiming coverage, failing to have personally present at the settlement conference a person with settlement authority, and taking a no–pay position. ACE is therefore entitled to summary judgment on M&W's claim that ACE breached the covenant of good faith and fair dealing implied into the Policy.

IV.    Conclusion

For the reasons stated above, Plaintiff M&W's Motion for Partial Summary Judgment [Doc. # 78] is GRANTED; and Defendant's Motion for Summary Judgment [Doc. # 79] is GRANTED IN PART as to Plaintiffs' Count Three (breach of covenant of good faith and fair dealing) and is OTHERWISE DENIED. Because the record is silent as to the amount of damages to which M&W is entitled, summary judgment will enter "on liability alone" pursuant to Federal Rule of Civil Procedure 56(d)(2).

Further, Plaintiffs are entitled to the following declarations: Defendant ACE American Insurance Company is obligated to defend Maher & Williams and its partners in the Malpractice Suits. Defendant ACE American Insurance Company is obligated to indemnify Maher & Williams and its partners for any losses they may incur in the Malpractice Suits, including but not limited to

reimbursing the Firm for the amounts paid on the judgments in the Malpractice Suits and otherwise satisfying any unpaid portion of those judgments.

No later than September 13, 2010, the parties shall file a joint stipulation of the amount of damages to which M&W is entitled or, if the parties do not agree on such damages, they shall file separate proposed orders supported with memoranda and documentation as appropriate.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 3rd day of September, 2010.